**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COACH, INC., COACH SERVICES, INC., and STUART WEITZMAN IP, LLC, )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," )<br><br>Defendants. ) | Case No. 16-cv-00982 |

**COMPLAINT**

Plaintiffs Coach, Inc., Coach Services, Inc. and Stuart Weitzman IP, LLC (collectively, "Plaintiffs") hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly

targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiffs' respective trademarks. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit versions of Plaintiffs' respective federally registered trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II.   INTRODUCTION

3.      This action has been filed by Plaintiffs to combat online counterfeiters who trade upon Plaintiffs' respective reputations and goodwill by selling and/or offering for sale unauthorized and unlicensed counterfeit products, including handbags, wallets, accessories, eyewear, footwear, jewelry, watches, clothing and other products, bearing counterfeit versions of Plaintiffs' federally registered trademarks (the "Counterfeit Products"). The Defendants create the Defendant Internet Stores by the hundreds or even thousands and design them to appear to be selling Plaintiffs' genuine products, while actually selling the Counterfeit Products to unknowing consumers. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the Counterfeit Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same

2

transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their massive counterfeiting operation. Plaintiffs are forced to file these actions to combat Defendants' counterfeiting of Plaintiffs' federally registered trademarks, as well as to protect unknowing consumers from purchasing the Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**Plaintiffs**

**Plaintiff Coach**

4.      Plaintiff Coach, Inc. is a corporation duly organized and existing under the laws of the State of Maryland, with its principal place of business in New York, New York.

5.      Plaintiff Coach Services, Inc. is a corporation duly organized and existing under the laws of the State of Maryland, with its principal place of business in Jacksonville, Florida, and which is ultimately owned by Coach, Inc.

6.      Coach, Inc. and Coach Services, Inc. (together, "Coach") is a worldwide leader in the design, manufacture and marketing of leather and mixed material products and fashion accessories (collectively, the "Coach Products"). Since 1941, Coach Products have been among the finest available anywhere. Coach Products, including, but not limited to, handbags, wallets, watches, jewelry, sunglasses, clothing, outerwear and shoes, have become enormously popular and even iconic, driven by Coach's arduous quality standards and innovative designs. Among the purchasing public, genuine Coach Products are instantly recognizable as such.

3

7.     Both in the United States and internationally, the Coach brand has come to symbolize high quality, and Coach Products are among the most recognizable handbags and accessories in the world.  Whether made entirely of leather or in combination with printed or other components, genuine Coach Products are greatly coveted as premier fashion accessories of the highest quality.

8.     The unique mix of function, workmanship, fashion and style that goes into each and every genuine Coach Product, as well as the brand's exclusive cache, results in Coach Products commanding a relatively high price at retail.  Coach's loyal customer base willingly pays more for genuine Coach Products than they would pay for lesser products both because Coach Products are of higher quality and durability than competitors' and because of the prestige associated with genuine Coach Products.  Coach is the exclusive distributor of Coach Products.

9.     Coach has sold leather goods under the COACH mark since 1941.  Coach Products have long been among the most popular luxury lifestyle items.  The COACH mark itself is iconic, symbolizing a unique blend of fashion, craftsmanship, style, and function, whether associated with handbags or other Coach Products.  Coach and its predecessors have achieved annual sales volume of more than four billion dollars ($4,000,000,000) on products bearing Coach's trademarks.  As such, Coach's trademarks, and the goodwill associated therewith, are among Coach's most valuable assets.  Coach owns, among others, the trademark and trade name "COACH" for purses, handbags, and wallets, as well as the highly distinctive mark pictured here (the "Signature C Mark"):



10.    Coach incorporates a variety of distinctive marks in the design of its various handbags, purses and other Coach Products.  Coach Products typically include at least one of Coach's federally registered trademarks.  Often several of Coach's trademarks appear on a single Coach Product.

11.    Coach has registered its trademarks with the United States Patent and Trademark Office.  Coach uses these trademarks in connection with the marketing of its Coach Products, including, *inter alia*, the following marks which are collectively referred to as the "COACH Trademarks."

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 2,088,706 | COACH | 6, 9, 16, 18, 20 and 25 for *inter alia* key fobs, eyeglass cases, cellular phone cases satchels, tags for luggage, luggage, backpacks, picture frames, hats, gloves and caps. | August 19, 1997 | COACH |
| 3,157,972 | COACH | 35 for retail store services. | October 17, 2006 | COACH |
| 0,751,493 | COACH | 14 for Leather Goods, namely, Utility Kits, Portfolios, Key Cases, Pass Cases, Billfolds, Wallets, Pocket Secretaries. | June 23, 1963 | COACH |
| 2,451,168 | COACH | 9 for eyeglasses. | May 15, 2001 | COACH |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 4,105,689 | COACH | 9 for sunglasses. | February 25, 2012 | COACH |
| 2,537,004 | COACH | 24 for *inter alia* home furnishings. | February 5, 2002 | COACH |
| 1,846,801 | COACH | 25 for men's and women's coats and jackets. | July 26, 1994 | COACH |
| 3,439,871 | COACH | 18 for umbrellas. | June 3, 2008 | COACH |
| 2,231,001 | COACH | 25 for clothing for men, women, namely, coats, jackets, overcoats, raincoats, shirts, vests, scarves, shoes and belts. | March 9, 1999 | COACH |
| 3,354,448 | COACH | 14 for *inter alia* jewelry. | December 11, 2007 | COACH |
| 2,446,607 | COACH | 16 for *inter alia* writing instruments. | April 24, 2001 | COACH |
| 2,291,341 | COACH | 14 for watches. | November 9, 1999 | COACH |
| 1,071,000 | COACH | 18, 25 for *inter alia* women's handbags and men's and women's belts. | August 9, 1977 | COACH |
| 3,633,302 | COACH | 3 for *inter alia* perfumes, lotions and body sprays. | June 2, 2009 | COACH |
| 4,168,626 | COACH NEW YORK | 18, 25 for *inter alia* briefcases, satchels, tote bags, duffle bags, key cases, coin cases, wallets, hats, caps, gloves, coats, jackets, overcoats, raincoats, scarves, shoes and belts. | July 3, 2012 | COACH NEW YORK |
| 4,296,584 | COACH NEW YORK | 9, 16 for cases for eyeglasses and sunglasses, sunglasses and spectacles, calendars | February 26, 2013 | COACH NEW YORK |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| | | and diaries. | | |
| 3,413,536 | COACH EST. 1941 STYLIZED | 14 for *inter alia* jewelry | April 15, 2008 |  |
| 2,534,429 | COACH & LOZENGE DESIGN | 9 for eyeglasses, eyeglass frames, and sunglasses. | January 29, 2002 |  |
| 3,363,873 | COACH & LOZENGE DESIGN | 3 for *inter alia* fragrances. | January 1, 2008 |  |
| 2,252,847 | COACH & LOZENGE DESIGN | 35 for retail services. | June 15, 1999 |  |
| 2,291,368 | COACH & LOZENGE DESIGN | 14 for *inter alia* watches. | November 9, 1999 |  |
| 2,534,429 | COACH & LOZENGE DESIGN | 9 for eyeglasses, eyeglass frames and sunglasses. | January 29, 2002 |  |
| 2,169,808 | COACH & LOZENGE DESIGN | 25 for *inter alia* clothing for men and women, namely, coats, jackets, scarves, shoes, and belts. | June 30, 1998 |  |
| 2,045,676 | COACH & LOZENGE DESIGN | 6, 9, 16, 18, 20, 25 for *inter alia* key fobs, money clips, phone cases, computer cases, briefcases, satchels, duffel bags, hats, caps and gloves. | March 18, 1997 |  |
| 1,070,999 | COACH & LOZENGE DESIGN | 18, 25 for *inter alia* women's handbags and men's and women's belts. | August 9, 1977 |  |
| 1,309,779 | COACH & LOZENGE DESIGN | 9, 16, 18 for *inter alia* eyeglass cases and leather goods, namely, wallets, purses and shoulder bags. | December 19, 1984 |  |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 2,035,056 | COACH & LOZENGE DESIGN | 3, 21 for *inter alia* leather cleaning products and shoe brushes. | February 4, 1997 | |
| 2,626,565 | CC & DESIGN (Signature C) | 18 for *inter alia* handbags, purses, clutches, shoulder bags, tote bags, and wallets. | September 24, 2002 | |
| 2,822,318 | CC & DESIGN (Signature C) | 24 for fabric for use in the manufacture of clothing, shoes, handbags, and luggage. | March 16, 2004 | |
| 2,832,589 | CC & DESIGN (Signature C) | 6, 9, 14, 18, for *inter alia* sunglasses and eyeglass cases, metal key fobs, leather key fobs, jewelry, watches, umbrellas. | April 13, 2004 | |
| 2,592,963 | CC & DESIGN (Signature C) | 25 for *inter alia* clothing namely, scarves, belts, gloves, hats, shoes, coats, jackets. | July 9, 2002 | |
| 2,822,629 | CC & DESIGN (Signature C) | 35 for retail services. | March 16, 2004 | |
| 4,365,898 | COACH Signature C Design | 9 for protective covers and cases for cell phones, laptops and portable media players. | July 9, 2013 | |
| 3,396,554 | AMENDED CC & DESIGN (Signature C) | 3 for fragrances. | March 11, 2008 | |
| 3,012,585 | AMENDED CC & DESIGN (Signature C) | 18, 24, 25 for *inter alia* handbags, purses, wallets, umbrellas, fabrics for the use in manufacturing clothing, shoes and handbags, clothing, namely | November 8, 2005 | |

8

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| | | scarves, hats, caps and shoes. | | |
| 3,784,814 | COACH OP ART | 9 for *inter alia* eyeglasses and sunglasses. | May 4, 2010 | |
| 4,365,899 | COACH OP ART | 9 for protective covers and cases for cell phones, laptops and portable media players. | July 9, 2013 | |
| 4,105,636 | COACH OP ART | 14, 18, 25 for jewelry, watches, wallets, handbags, belts, hats, scarves, shoes, coats, gloves and t-shirts. | February 28, 2012 | |
| 3,696,470 | COACH OP ART & Design | 18, 24 and 25 for *inter alia* handbags, wallets, umbrellas, hats, scarves, belts, coats, shoes and fabrics for the manufacturing of clothing, shoes and handbags. | October 13, 2009 | |
| 4,391,741 | COACH LEATHERWA RE EST. 1941 [Heritage Logo] | 3 for after-shave, body lotions, fragrances, make-up, perfumes, soaps for personal use. | August 27, 2013 | |
| 4,296,582 | COACH EST. 1941 NEW YORK | 14,16,18 and 25 for *inter alia* jewelry and watches, handbags, leather credit card cases, purses, shoulder bags, wallets, belts, coats, t-shirts, hats, gloves, shoes, day planners. | February 26, 2013 | |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 4,359,191 | COACH EST. 1941 NEW YORK | 9 for protective covers and cases for cell phones, laptops and portable media players. | June 25, 2013 |  |
| 3,251,315 | COACH EST. 1941 | 18, 25 for *inter alia* handbags, small leather goods, jackets, coats and shoes. | June 12, 2007 |  |
| 3,338,048 | COACH STYLIZED | 18 for *inter alia* luggage, backpacks, purses, wallets, and shoulder bags. | November 11, 2007 |  |
| 3,149,330 | C & LOZENGE LOGO | 14 for watches. | September 26, 2006 |  |
| 2,162,303 | COACH & TAG DESIGN | 25 for belts. | June 2, 1998 |  |
| 4,334,351 | COACH & TAG | 9 for protective covers and cases for cell phones, laptops and portable media players. | May 14, 2013 |  |
| 3,685,590 | COACH & TAG | 14 for bracelets, earrings, jewelry, necklaces, rings being jewelry, watches. | September 22, 2009 |  |
| 2,088,707 | COACH & TAG DESIGN | 18 for *inter alia* briefcases, handbags, satchels, tote bags, duffle bags, cosmetic bags, luggage. | August 19, 1997 |  |
| 3,908,558 | POPPY | 9 for eyeglasses and sunglasses. | January 18, 2011 | POPPY |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 3,812,170 | POPPY | 18 for *inter alia* backpacks, briefcases, leather key chains, handbags, wallets and billfolds. | June 29, 2010 | POPPY |
| 4,744,715 | COACH NEW YORK | 18 for handbags; purses; tote bags; clutch purses; wristlet bags; shoulder bags; messenger bags; duffle bags; backpacks; briefcases; travel bags; luggage; garment bags for travel; bags for carrying babies' accessories; wallets; billfolds; luggage tags; cosmetic cases sold empty; toiletry cases sold empty; key cases and wallets; business card cases; credit card cases; coin purses; umbrellas; pet collars and leashes; and leather boxes. | May 26, 2015 | COACH NEW YORK |
| 4,744,716 | COACH NEW YORK | 16 for notebooks; address books; daily planners; diaries; paper refills for notebooks, address books, daily planners, diaries, and calendars; paper weights; desk file trays; bookmarks; pencil cases; checkbook covers; money clips; paper shopping bags; boxes of paper or cardboard; paper holders for receipts; and tissue paper. | May 26, 2015 | COACH NEW YORK |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 4,744,718 | COACH NEW YORK | 25 for clothing, namely, coats, jackets, overcoats, raincoats, vests, parkas, capes, blouses, shirts, t-shirts, tank tops, tunics, sweaters, sweatshirts, skirts, pants, dresses, scarves, swimwear; belts; gloves; hats; and footwear. | May 26, 2015 |  |
| 4,744,719 | COACH NEW YORK | 3 for fragrances; aftershaves; colognes; leather cleaning and moisturizing preparations; and fabric cleaners. | May 26, 2015 |  |
| 4,744,720 | COACH NEW YORK | 9 for sunglasses; eyeglasses; optical frames; cases for eyeglasses and sunglasses; adapter plugs; cell phone cases; cell phone covers; carrying cases for cell phones; protective covers and cases for tablet computers; and mouse pads. | May 26, 2015 |  |
| 4,744,721 | COACH NEW YORK | 14 for watches; jewelry; and ornamental pins. | May 26, 2015 |  |
| 4,814,094 | COACH NEW YORK | 18 for handbags; purses; tote bags; clutch purses; wristlet bags; shoulder bags; messenger bags; duffle bags; backpacks; briefcases; travel bags; luggage; garment bags for travel; bags for carrying babies' accessories; cosmetic | September 15, 2015 |  |

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| | | cases sold empty; and toiletry cases sold empty. | | |
| 4,754,870 | COACH NEW YORK | 3, 6 for fragrances; key fobs of common metal; and metal rings and chains for keys. | June 16, 2015 | COACH NEW YORK |
| 4,731,665 | COACH OUTLET | 35 for retail and online store services featuring leather goods, handbags, wallets, luggage, jewelry, watches, small leather goods, clothing, shoes, fragrance, eyewear, toys, desk accessories and pet products. | May 5, 2015 | COACH OUTLET |
| 4,863,326 | COACH | 35 for retail and online retail store services featuring leather goods, handbags, wallets, luggage, jewelry, watches, small leather goods, clothing, shoes, fragrance, eyewear, toys, desk accessories and pet products. | December 1, 2015 | COACH |
| 4,731,666 | COACH OUTLET.COM | 35 for online store services featuring leather goods, handbags, wallets, luggage, jewelry, watches, small leather goods, clothing, shoes, fragrance, eyewear, toys, desk accessories and pet products. | May 5, 2015 | COACHOUTLET.COM |

12. The above U.S. registrations for the COACH Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. The registrations

13

for the COACH Trademarks constitute *prima facie* evidence of their validity and of Coach's exclusive right to use the COACH Trademarks pursuant to 15 U.S.C. § 1057(b). True and correct copies of the United States Registration Certificates for the above-listed COACH Trademarks are attached hereto as **Exhibit 1**.

13.     The COACH Trademarks are unique and distinctive when applied to the Coach Products and identify the merchandise as high-quality goods from Coach.

14.     Coach Products have long been among the most popular purses and handbags in the world, and have been extensively promoted and advertised at great expense. In fact, Coach and its predecessors have expended more than 100 million dollars ($100,000,000) annually in advertising, promotion and marketing featuring the COACH Trademarks. Coach Products also have been the subject of extensive unsolicited publicity resulting from their high quality, luxurious materials and designs, and renown as desired luxury items. Because of these and other factors, the Coach name and the COACH Trademarks have become famous throughout the United States.

15.     Coach maintains strict quality control standards for all of its Coach Products. All authorized Coach Products are sold only through Coach stores and authorized retail channels such as Bloomingdale's and Nordstrom.

16.     The Coach name and logos have become famous trademarks identifying the products on which they have long been used as emanating from a single source. Genuine Coach Products, so marked, have been, and continue to be, recognized and exclusively associated by the fashion industry and the public with Coach.

14

17.     The COACH Trademarks have achieved tremendous fame and recognition that has added to the inherent distinctiveness of the marks, and the goodwill associated with the COACH Trademarks is of incalculable and inestimable value to Coach.

18.     The COACH Trademarks have been continuously used and never abandoned.

19.     Since at least as early as 1996, Coach has operated a website where it promotes and sells genuine Coach Products at coach.com.  Sales of Coach Products at coach.com represent a significant portion of Coach's business.  The coach.com website features proprietary content, images and designs exclusive to the Coach brand.  Coach also owns and operates the website located at coachoutlet.com.  All authorized Coach Products sold online are only sold through coach.com, coachoutlet.com, or other authorized online retailers, such as bloomingdales.com and nordstrom.com.

20.     Coach has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the COACH Trademarks.  As a result, products bearing the COACH Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Coach.  Coach Products have also become among the most popular of their kind in the world, with Coach's annual global sales currently exceeding four billion dollars ($4,000,000,000).

21.     Coach Products are widely accepted by the public and enormously popular, as demonstrated by the billions of dollars in sales of Coach Products each year.

**Plaintiff Stuart Weitzman**

22.     Plaintiff Stuart Weitzman IP, LLC is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Fort Lauderdale, Florida, and which is ultimately owned by Coach, Inc.

23.     Plaintiff Stuart Weitzman IP, LLC ("Stuart Weitzman") is an internationally recognized manufacturer, distributor and retailer of high quality footwear and other goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks (collectively, the "Stuart Weitzman Products").

24.     Stuart Weitzman has registered its trademarks with the United States Patent and Trademark Office.  Stuart Weitzman uses these trademarks in connection with the marketing of its Stuart Weitzman Products, including, *inter alia*, the following marks which are collectively referred to as the "STUART WEITZMAN Trademarks."

| Registration No. | Mark | Classes, Goods and Services | Date of Registration | Image |
|---|---|---|---|---|
| 4,291,172 | SW1 | 18, 25 for handbags and footwear. | February 19, 2013 | SW1 |
| 4,219,167 | DIAMOND STUART WEITZMAN | 25 for shoes. | October 2, 2012 | DIAMOND |
| 3,474,821 | STUART WEITZMAN | 18, 25, 35 for handbags, shoes, and retail store services featuring shoes, handbags and pocketbooks. | July 29, 2008 | STUART WEITZMAN |
| 2,571,208 | A LITTLE OBSESSED WITH SHOES | 25 for women's shoes. | May 21, 2002 | A LITTLE OBSESSED WITH SHOES |
| 2,749,908 | STUART WEITZMAN | 35 for retail store services featuring shoes, handbags and pocketbooks. | August 12, 2003 | STUART WEITZMAN |
| 1,386,002 | STUART WEITZMAN | 18, 25 for handbags and shoes. | March 11, 1986 | STUART WEITZMAN |

25.     The above U.S. registrations for the STUART WEITZMAN Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. §

1065.   The registrations for the STUART WEITZMAN Trademarks constitute *prima facie* evidence of their validity and of Stuart Weitzman's exclusive right to use the STUART WEITZMAN Trademarks pursuant to 15 U.S.C. § 1057(b).   True and correct copies of the United States Registration Certificates for the above-listed STUART WEITZMAN Trademarks are attached hereto as **Exhibit 2**.

26.   The STUART WEITZMAN Trademarks have achieved tremendous fame and recognition that has added to the inherent distinctiveness of the marks, and the goodwill associated with the STUART WEITZMAN Trademarks is of incalculable and inestimable value to Stuart Weitzman.   The STUART WEITZMAN Trademarks have been continuously used and never abandoned.

27.   Stuart Weitzman operates a website where it promotes and sells genuine Stuart Weitzman Products at stuartweitzman.com.   All authorized Stuart Weitzman Products sold online are only sold through stuartweitzman.com or other authorized online retailers, such as bloomingdales.com and nordstrom.com.

**Plaintiffs' Trademarks and Plaintiffs' Products**

28.   The COACH Trademarks and STUART WEITZMAN Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

29.   The Stuart Weitzman Products and the Coach Products are collectively referred to herein as "Plaintiffs' Products."

**The Defendants**

30.   Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions.   Defendants conduct business throughout the United States, including within the State of Illinois and this

17

Judicial District, through the operation of the fully interactive, commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell, and on information and belief, has sold and continues to sell the Counterfeit Products to consumers within the United States, including the State of Illinois.

31.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products bearing counterfeit versions of Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences. Tactics used by Defendants to conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their massive counterfeit network. In the event that Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV.   DEFENDANTS' UNLAWFUL CONDUCT

32.     The success of the Coach and Stuart Weitzman brands has resulted in their significant counterfeiting. Consequently, Plaintiffs have a worldwide anti-counterfeiting program and regularly investigate suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. In recent years, Plaintiffs have identified thousands of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer and Aliexpress, including the Defendant Internet Stores, which were offering for sale, selling, and importing the Counterfeit Products to consumers in this Judicial District and throughout the United States. Despite Plaintiffs' enforcement efforts online

and on the ground, Defendants have persisted in creating the Defendant Internet Stores, which generate massive profits selling the Counterfeit Products. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2014 was over $1.23 billion. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

33. Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine Plaintiffs' Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal. Numerous Defendant Domain Names also incorporate the Plaintiffs' Trademarks into the URL, and the Defendant Internet Stores often include content and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. This includes using proprietary images taken directly from Plaintiffs' respective websites or from the websites of other authorized retailers of Plaintiffs' Products. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Plaintiffs have not licensed or authorized Defendants to use any of the Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

19

34.     Defendants also deceive unknowing consumers by using the Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products.  Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine Plaintiffs' Products.  Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.  As such, Plaintiffs also seek to disable Defendant Domain Names owned by Defendants that are the means by which the Defendants could continue to sell the Counterfeit Products.

35.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores.  For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states.  Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information.  On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are just one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

36.     Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores.  For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names.  In addition, the Counterfeit Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.  The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Plaintiffs' websites or those of other authorized retailers of Plaintiffs' Products.

37.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts.  For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit.  Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received.  Rogue servers are notorious for ignoring take down demands sent by brand owners.  Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.  A 2012 U.S. Customs and Border Protection report on seizure statistics indicated

21

that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

38. Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts. On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

39. Defendants, without any authorization or license from Plaintiffs, have knowingly and willfully used and continue to use the Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and sale of the Counterfeit Products into the United States and Illinois over the Internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold the Counterfeit Products into the United States, including Illinois.

40. Defendants' use of the Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of the Counterfeit Products, including the sale of the Counterfeit Products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and has caused and will continue to cause irreparable harm to Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

41.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 40.

42.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. The Plaintiffs' Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Plaintiffs' Products sold or marketed under the Plaintiffs' Trademarks.

43.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products bearing counterfeit reproductions of the Plaintiffs' Trademarks without Plaintiffs' permission.

44.     Coach is the exclusive owner of the COACH Trademarks, and Stuart Weitzman is the exclusive owner of the STUART WEITZMAN Trademarks.  Plaintiffs' United States Registrations for the Plaintiffs' Trademarks (Exhibits 1 and 2) are in full force and effect.  Upon information and belief, Defendants have knowledge of Plaintiffs' rights in the Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits of the Plaintiffs' Trademarks.  Defendants' willful, intentional and unauthorized use of the Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

45.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

46.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their respective reputations and the goodwill of their well-known Plaintiffs' Trademarks.

47.    The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of the Counterfeit Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

48.    Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 47.

49.    Defendants' promotion, marketing, offering for sale, and sale of the Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

50.    By using the Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

51.    Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

52.    Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their respective reputations and the goodwill of their brands.

**COUNT III**
**CLAIM FOR INJUNCTIVE RELIEF UNDER THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. § 1125(d)) AS TO THE DEFENDANTS OPERATING A DEFENDANT DOMAIN NAME INCORPORATING ANY OF THE PLAINTIFFS' TRADEMARKS**

24

53.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 52.

54.     Coach is the exclusive owner of the COACH Trademarks, and Stuart Weitzman is the exclusive owner of the STUART WEITZMAN Trademarks.  The U.S. Registrations for the Plaintiffs' Trademarks (Exhibits 1 and 2) are in full force and effect.  Additionally, the Plaintiffs' Trademarks are highly distinctive and famous marks pursuant to 15 U.S.C. § 1125 and were famous before and at the time of the registration of the Defendant Domain Names.

55.     Upon information and belief, Defendants operating a Defendant Domain Name incorporating any of the Plaintiffs' Trademarks have acted with bad faith intent to profit from the unauthorized use of the Plaintiffs' Trademarks and the goodwill associated therewith by registering, trafficking in, or using various domain names which are identical to, confusingly similar to, or dilutive of the Plaintiffs' Trademarks.

56.     Defendants have no intellectual property rights in or to the Plaintiffs' Trademarks.

57.     Defendants' actions constitute willful cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

58.     Plaintiffs have no adequate remedy at law, and the registration and use of the Defendant Domain Names incorporating any of the Plaintiffs' Trademarks has caused, is causing, and is likely to continue to cause substantial and irreparable injury to the public and to Plaintiffs.

## COUNT IV
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS § 510, *et seq.*)

59.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 58.

60.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit Products as those of Plaintiffs; causing a likelihood of confusion and/or misunderstanding as to the source of their goods; causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine Plaintiffs' Products; representing that their Counterfeit Products have Plaintiffs' approval when they do not; and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

61.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

62.     Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to their respective reputations and goodwill.  Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a.  using the Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with the Plaintiffs' Trademarks;

b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not a genuine Plaintiffs' Product or not produced under the authorization, control or supervision of Plaintiffs and approved by Plaintiffs for sale under the Plaintiffs' Trademarks;

c.  committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

d.  further infringing the Plaintiffs' Trademarks and damaging Plaintiffs' goodwill;

e.  otherwise competing unfairly with Plaintiffs in any manner;

f.  manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any Plaintiffs' trademark, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, the Defendant Domain Names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell the Counterfeit Products; and

h.  operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable

imitations thereof that is not a genuine Plaintiffs' Product or not authorized by Plaintiffs to be sold in connection with the Plaintiffs' Trademarks; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiffs a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3) Entry of an Order that, at Plaintiffs' choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars, including, but not limited to, GoDaddy Operating Company, LLC ("GoDaddy"), Name.com, PDR LTD. d/b/a PublicDomainRegistry.com ("PDR"), 1api GmbH ("1api"), HEXONET GmbH ("HEXONET"), and Namecheap Inc. ("Namecheap") shall take any steps necessary to transfer the Defendant Domain Names to a registrar account of Plaintiffs' selection; or that the same domain name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

4) Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as iOffer and domain name registrars, including, but not limited to, GoDaddy, Name.com, PDR, 1api, HEXONET, and Namecheap, shall:

    a. disable and cease providing services for any accounts through which Defendants, currently or in the future, engage in the sale of goods using the Plaintiffs' Trademarks, including, but not limited to, any accounts associated with the Defendants listed on Schedule A; and

    b. disable any account linked to Defendants, linked to any e-mail addresses used by Defendants, or linked to any Defendant Domain Names;

5) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Plaintiffs' Trademarks and $100,000 per domain name incorporating any of the Plaintiffs' Trademarks pursuant to 15 U.S.C. § 1117(d);

7) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

8) Award any and all other relief that this Court deems just and proper.


Dated this 22nd day of January 2016.    Respectfully submitted,


    /s/ Justin R. Gaudio_____
    Kevin W. Guynn
    Amy C. Ziegler
    Justin R. Gaudio
    Jessica L. Bloodgood
    Greer, Burns & Crain, Ltd.
    300 South Wacker Drive, Suite 2500
    Chicago, Illinois 60606
    312.360.0080 / 312.360.9315 (facsimile)

kguynn@gbclaw.net
aziegler@gbclaw.net
jgaudio@gbclaw.net
jbloodgood@gbclaw.net

*Counsel for Plaintiffs Coach Inc., Coach Services, Inc. and Stuart Weitzman IP, LLC*